United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

ROKSANA MEDANI, et al.,

Plaintiffs,

v.

DONALD J. TRUMP, et al.,

Defendants.

Case No. 5:26-cv-06332-EJD

**ORDER GRANTING IN PART MOTION FOR SUPPLEMENTAL RELIEF**

Re: Dkt. No. 121

Before the Court is Plaintiffs' emergency motion for supplemental relief regarding the Court's August 28, 2026, Preliminary Injunction ("PI"). Mot., ECF No. 121; Opp'n, ECF No. 129; Reply, ECF No. 132; *see also* PI Order, ECF No. 83. The Court held a hearing on September 29, 2026, and heard oral arguments from the parties. ECF No. 134. For the reasons stated below, the Court **GRANTS IN PART** Plaintiffs' motion.

## I. BACKGROUND

The Court issued an order on August 28, 2026, temporarily vacating two policies promulgated by the Department of State ("DOS")[1] and ordered "DOS, to the extent practicable and in good faith, to take all reasonable steps during the remainder of the Diversity Visa fiscal year to reconsider applications refused solely under the DOS DV Pause or the DOS 75-Country Pause and resume ordinary adjudication of pending applications." PI Order 22. The Court also noted that its order did "not foreclose the possibility of supplemental relief pending report on

[1] The PI also temporarily vacated a third policy promulgated by USCIS, but according to Plaintiffs, USCIS diligently complied with the Court's order and is thus not subject to the present motion.

Defendants' good faith efforts to comply with these directives." *Id.*

Ten days later, on September 8, Plaintiffs filed their first emergency motion, arguing that DOS had not complied with the Court's order. First Emergency Mot., ECF No. 87. Specifically, Plaintiffs alleged that DOS "has not scheduled a single consulate interview for any plaintiff since the Court's Order issued, and it is now affirmatively cancelling the September 2026 interviews that had already been scheduled for named plaintiffs." *Id.* at 2. Plaintiffs also alleged that DOS had continued affirmatively enforcing the vacated policies through at least September 1, 2026, when a class member received an email from a consular office in Taiwan that stated: "Please be advised that as the suspension of the DV2026 program continues, all administrative processing for DV applicants remains paused pending further instructions." *Id.*, Ex. B1, ECF No. 87-2; *see also id.*, Ex. B2–B23, ECF Nos. 87-3–87-24 (correspondences from DOS refusing additional documentation, rescheduling interviews to an unknown time and date, etc.). In response, DOS did not deny that it had not scheduled or conducted a single interview, or issued a single Diversity Visa, since the date of the PI. *See* Opp'n to First Emergency Mot., ECF No. 89. Rather, DOS contended that it spent this time creating "guidance" on how DOS personnel should comply with the Court's order. *Id.* at 3–4.

The Court held a hearing on Plaintiffs' first emergency compliance motion on September 10. ECF No. 91. During this hearing, DOS's counsel informed the Court that DOS had sent a cable to all diplomatic and consular posts earlier that morning instructing all posts to, among other things, "[i]mmediately begin reviewing IV or DV-2026 cases that were previously refused" solely due to the DOS policies; "prioritize reconsideration of IV or DV-2026 cases previously refused under the IV or DV pause"; and review and update all public representations regarding the DOS policies. ECF No. 95-1.

The Court issued an order later that day. Order Enforcing PI, ECF No. 93. In its order, the Court explained it was "troubled by DOS's failure to schedule a single interview—and affirmative cancellation of already scheduled interviews—following the Court's explicit order that 'DOS, to the extent practicable and in good faith, [] take all reasonable steps during the remainder of the

Diversity Visa fiscal year to reconsider applications refused solely under the DOS DV Pause or the DOS 75-Country Pause and resume ordinary adjudication of pending applications.'" *Id.* at 3. The Court was also "troubled by DOS's ten-day delay in instructing its personnel to comply with the PI given that, '[w]ith each day that passes, hundreds of selectees lose their opportunity to receive a Diversity Visa before the end of the fiscal year.'" *Id.* However, given the recent cable directing compliance with the PI, the Court found the most appropriate relief at that time was an order directing DOS to file a status report every Monday, Wednesday, and Friday until the end of the fiscal year, informing the Court of: recent actions taken to comply with the Court's order; the number of interviews scheduled and held since the last status report; and the number of visas issued and denied since the last status report. *Id.* The Court indicated that it would closely monitor the status reports as to whether they "reflect a lack of good faith effort to comply with the PI." *Id.*

The status reports that followed provided the Court with the following information:

- As of September 14, DOS refused 169 visas and issued 1 visa. ECF No. 97.
- From September 14–16, DOS refused 218 visas and issued 28 visas. ECF No. 102.
- From September 16–18, DOS refused 298 visas and issued 51 visas. ECF No. 105.
- From September 18–21, DOS refused 67 visas and issued 4 visas. ECF No. 112.

At this point, DOS had processed 836 visas, approximately 83 visas per day, worldwide. Plaintiffs filed a response to these reports, taking issue with the noticeably slow pace of adjudication, as well as continued communication by consulates to Plaintiffs that they were not, in fact, processing Diversity Visas, and affirmative cancellations of interviews already scheduled. ECF No. 118.

On September 21, the Court held another hearing in response to Plaintiffs' filing. ECF No. 110. During this hearing, similar to the September 10 hearing, DOS informed the Court that it sent an email to all diplomatic and consular posts that morning, "re-affirming" the PI and instructing posts to comply. DOS otherwise informed the Court that the minimal visa processing was due to a new "training initiative" regarding the public charge rule.

The Court again expressed its disappointment during this hearing. The Court noted that in September 2025, DOS adjudicated roughly 230 visas per day and queried whether DOS planned to return to this pace, to which DOS did not have a definite response. The Court indicated that it would continue closely monitoring the status reports and ordered additional information in future reports, including the visa processing data disaggregated according to the six regions.

Following the Court's second enforcement hearing, DOS increased the pace at which they processed Diversity Visas to more closely mirror September 2025. Specifically, the status reports provided the Court with the following information:

- From September 21–23, DOS refused 309 visas and issued 422 visas. ECF No. 119.
- From September 23–25, DOS refused 452 visas and issued 910 visas. ECF No. 126.
- From September 25–28, DOS refused 275 visas and issued 610 visas. ECF No. 130.

This was a significant improvement. As of September 28, DOS had processed 3,814 visas, approximately 272 visas per day, worldwide.

The Court is now faced with the question, on the last day of the fiscal year, whether DOS complied in good faith with the Court's order; and if not, what remedy is appropriate.

## II. LEGAL STANDARD

"[T]he [Supreme] Court has recognized that courts have 'inherent' and 'ancient' authority to manage their own courtroom and enforce their orders." *Hunter v. United States*, 608 U.S. 713, 762 n.10 (2026) (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630 (1962)); *see also United States v. Yacoubian*, 24 F.3d 1, 5 (9th Cir. 1994) ("There [is] no question that courts have inherent power to enforce compliance with their lawful orders . . . . ") (internal quotation marks omitted) (quoting *Shillitani v. United States*, 384 U.S. 364, 370 (1966)). This inherent authority is "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs." *Link*, 370 U.S. at 630 (discussing inherent authority in regard to sua sponte dismissals). This has "remain[ed] settled law [for] over 150 years." *Sub-Zero, Inc. v. Wasserman*, No. 2:18-CV-428-JFW-MAR, 2025 WL 1111551, at *3 (C.D. Cal. Mar. 27, 2025), *appeal*

*dismissed*, No. 25-2377, 2025 WL 4689487 (9th Cir. Nov. 12, 2025).[2]

## III. DISCUSSION

This is a unique case. Time is particularly of the essence here as the end of the Diversity Visa fiscal year fast approaches. *See* PI Order 1–3 (describing Diversity Visa statutory scheme). The importance of *timely* compliance cannot be understated. When the Court issued the PI on August 28, it expected immediate compliance—it expected DOS to make all reasonable efforts during each day remaining in the fiscal year to adjudicate Diversity Visas pursuant to its order.[3]

The Court finds DOS's compliance with the PI has been less than substantial, and its lack of diligence from the time it received the Court's order to the time it implemented the order is of exceptional significance. DOS excuses its initial ten-day delay on the creation of guidance.[4] DOS states that it required this additional time to interpret the Court's order and decide how to instruct all diplomatic and consular posts regarding compliance.[5] That may be so; but given the unique circumstances, the Court would expect DOS to file a motion to stay enforcement of the PI pending creation of this guidance, ask for other relief, or at a minimum, file a status report informing the Court of its delay and the reasons for it. Instead, DOS remained silent and failed to proceed until Plaintiffs brought their noncompliance to the Court's attention—including waiting until moments before the September 10 hearing to send out its cable.

And even after the September 10 hearing, though DOS resumed processing Diversity

[2] The Court notes that it "does not rely on its authority to impose civil contempt sanctions to enforce its [order]," thus any argument that Plaintiffs have failed "to prove [DOS's] conduct warrants sanctions is irrelevant to the Court's analysis." *Ryan Ben Campbell v. Warden Adelanto ICE Processing Ctr.*, No. EDCV 26-02397-KK-MARX, 2026 WL 2138168, at *2 (C.D. Cal. June 29, 2026); *see also Przhebelskaya v. U.S. Bureau of Citizenship & Immigr. Servs.*, 338 F. Supp. 2d 399 (E.D.N.Y. 2004) (granting relief to compel performance but not reaching the issue of contempt).

[3] Noncompliance may be found if a party failed to comply with the "spirit of the injunction, even though its strict letter may not have been disregarded." *Epic Games, Inc. v. Apple Inc.*, 161 F.4th 1162, 1176 (9th Cir. 2025), *cert. granted in part*, 146 S. Ct. 2812 (2026).

[4] The Court begins this period of noncompliance on the Monday following the Court's Friday August 28 order.

[5] The Court notes that the PI merely required DOS to "resume ordinary adjudication," and DOS had familiarity with similar language from the injunction issued in *Ivanov, et al., v. Trump, et al.*, No. CV 26-2272 (RJL), 2026 WL 2494805, at *1 (D.D.C. Aug. 25, 2026), just days prior.



United States District Court
Northern District of California

United States District Court
Northern District of California

Visas, they did so at an unprecedented glacial pace. The average number of Diversity Visas adjudicated in September 2025 was, according to DOS, 230 visas per day. ECF No. 89. Yet between September 10 and the next compliance hearing on September 21, DOS adjudicated only 83 visas per day, worldwide. DOS credited this unusually slow pace to a new "training initiative," described as follows:

> Following months-long planning and deliberations by the Department that had begun prior to this Court's August 28, 2026 order . . . , the Department instructed all regional posts to complete a set of required training related to public charge inadmissibility before processing and adjudicating immigrant visa applications. Therefore, regional posts that have not completed such training are, subject to certain exceptions, generally not permitted to resume immigrant visa processing.

ECF No. 105; *see also* ECF No. 107.[6] However, again here DOS never, on its own volition, notified the Court of this new "training initiative" and its impact on compliance with the Court's order. Once again, they waited until Plaintiffs brought this issue to the Court's attention, ECF No. 103, then sent an email to all diplomatic and consular posts "affirming" guidance the Court's order on the afternoon of the September 21 hearing. ECF No. 115-1.

Following the September 21 hearing, DOS resumed Diversity Visa adjudication with the diligence expected from the Court. But prior to this time, given the increasingly narrow window of days remaining in the fiscal year, the delayed cable and new training initiative—and DOS's failure to timely communicate either to the Court—materially frustrated the Court's order.

Considering this series of events, the Court finds the most measured and tailored remedy—narrowly tied to the facts of this case and the language of the PI—is to require that DOS continue adjudicating Diversity Visas pursuant to the terms of the PI for ten additional days, the same period of time DOS failed to instruct all diplomatic and consular posts to comply with the Court's order.

DOS contends that a remedy such as this, that extends Diversity Visa adjudication past the fiscal year, runs contrary to the D.C. Circuit's holding in *Goodluck v. Biden*, 104 F.4th 920 (D.C.

[6] There was no information provided regarding when DOS provided this instruction.

Cir. 2024). DOS's point is well-taken. In *Goodluck*, the district court found COVID-related pauses in adjudicating Diversity Visas violated the APA, and as a remedy, reserved all unused Diversity Visas to be issued past the fiscal year. *Id.* at 921. The Circuit reversed, finding the district court lacked the authority to craft an equitable remedy requiring that DOS reserve and grant all allotted Diversity Visas past the applicable fiscal year because it conflicted with the INA provisions and DOS regulations that set September 30 as the cut-off. *Id.* at 923–25. However, the Circuit importantly left open the question of whether similar orders may be issued to remedy noncompliance with a court order:

> In a slight variation on this theme, the plaintiffs raise a specter that enforcement of the statutory deadline would enable the government "to avoid the full impact of court orders by simply dragging its feet." Joint Brief for Plaintiffs-Appellees at 83, *Goodluck v. Biden*, No. 21-5263 (June 9, 2022). But the initial injunction in this case, entered before the end of the relevant fiscal year, merely required the government to "undertake good-faith efforts" to process diversity-visa applications "expeditiously" and until the end of the fiscal year. The plaintiffs here do not contend that the government violated that obligation, much less that they did so willfully. Accordingly, we need not consider whether, if there were such a case of bad faith or undue delay in complying with a timely entered injunction, the district court could issue contempt sanctions against the government even if it could not grant relief directly to visa applicants past the end of the fiscal year.

*Id.* at 929 (internal citation omitted).

The facts, procedural posture, and remedy in this case differ materially from those presented in *Goodluck*. As an initial matter, the Court declines Plaintiffs' invitation to implement the remedy rejected in *Goodluck*—to reserve all unused Diversity Visas, estimated at approximately 40,000, to be issued past the 2026 fiscal year. The Court finds this proposed remedy untethered to the noncompliance at issue here and overly broad. While Congress allotted 55,000 Diversity Visas to be approved each fiscal year, the government is under no obligation to meet this number. 8 U.S.C. §§ 1151, 1154(a)(1)(I)(ii)(II). But perhaps more importantly, unlike in *Goodluck*, Plaintiffs do in fact contend that DOS was less than adherent to the Court's order, and the Court agrees. Thus, the Court's remedy here derives from its "inherent authority" to enforce its own orders, not from the equitable powers at issue in *Goodluck*.

United States District Court
Northern District of California

Other district court cases issued similar relief in response to noncompliance.[7] For example, in *Paunescu v. I.N.S.*, 76 F. Supp. 2d 896 (N.D. Ill. 1999), the court issued an order on September 25, 1998, that the government complete processing two plaintiffs' Diversity Visas before the end of the fiscal year. The government did not accomplish this. The court held:

> Defendants contend that they attempted to comply with the court's September 25, 1998, order before the end of the fiscal year. According to a memo written by defendants' counsel on September 24, 1998, defendants planned to send the September 25, 1999, order to the FBI and to ask the FBI to expedite Teodor's fingerprints. Jeffrey Gorski, a lawyer employed by the Department of State's Visa Office, attests that on September 30, 1998, the Assistant United States Attorney asked the Visa Office to issue a visa to the INS to allow plaintiffs' adjustment of incomplete, presumably because the FBI had not yet cleared Teodor's prints. The FBI's report shows that it did not receive Teodor's fingerprints until October 7, 1998. On October 8, 1998, Teodor's fingerprints cleared.
>
> Plaintiffs were the victims of a bureaucratic nightmare. Although defendants have demonstrated that they made some efforts to comply with this court's September 25, 1999, order, the evidence demonstrates that none of the responsible parties coordinated their efforts to ensure that this court's order could be implemented. Plaintiffs should not be penalized for the government's misfeasance.

*Id.*

Similarly, in *Przhebelskaya v. U.S. Bureau of Citizenship & Immigr. Servs.*, 338 F. Supp. 2d 399 (E.D.N.Y. 2004), the court reserved Diversity Visas past the fiscal year for three plaintiffs after the government failed to comply with its order to process their applications by the deadline. Notably, the court observed:

> When a district court orders the adjudication of an application for status adjustment based on the applicant's eligibility to receive a diversity visa, the Agency has an absolute duty to complete the adjudication and, if it finds that all of the application requirements are met, to issue the visa and grant the corresponding adjustment of status. Neither the expiration of the statutory deadline nor the fulfillment of the statutory quota extinguishes the Agency's obligation to comply with the court's order. Allowing the Agency to delay the adjudication and then claim inability to issue the visa "would impinge the authority of the court."

---

[7] The Court recognizes these are pre-*Goodluck* cases and were never challenged on appeal, but finds them factually distinguishable from *Goodluck* for the reasons stated in this Order.

*Id.* at 403 (quoting *Iddir v. Immigration and Naturalization Service*, 301 F.3d 492, 501 n.2 (7th Cir. 2002)).

The Court recognizes *Goodluck* teaches that district courts may not have the authority to order continued adjudication of FY-26 Diversity Visa applicants past the end of the fiscal year as an initial *equitable* remedy.[8] But the Court does not interpret *Goodluck* as precluding courts from issuing similar relief pursuant to their inherent authority to enforce their own orders, and instead, finds the logic in *Paunescu* and *Przhebelskaya* more relevant.

Ultimately, courts must be equipped with the tools necessary to ensure orders are not meaningless. Suggesting otherwise—that even if the Court finds an egregious lack of compliance for the entire fiscal year, the Court has no ability to compel compliance past the statutory deadline—completely disarms the judicial branch at the whims of another branch of government. Such a result would be "absurd." *See, e.g., Idaho v. Coeur d'Alene Tribe*, 794 F.3d 1039, 1043 (9th Cir. 2015) ("The Court disfavors constructions that would lead to absurd . . . results."); *Arizona State Bd. For Charter Schs. v. U.S. Dep't of Educ.*, 464 F.3d 1003, 1008 (9th Cir. 2006) ("[W]ell-accepted rules of statutory construction caution us that "statutory interpretations which would produce absurd results are to be avoided.").

To preserve the integrity of the judiciary, remedy the period of noncompliance, and ensure the full enforcement of its order, the Court **GRANTS IN PART** Plaintiffs' motion for supplemental relief.[9]

## IV. CONCLUSION

Based on the foregoing, the Court **ORDERS**:

- DOS, to the extent practicable and in good faith, shall take all reasonable steps for

[8] The Court notes *Goodluck* is not precent in the Ninth Circuit and makes no findings regarding the Court's authority to issue such equitable relief at this time.

[9] In response to discussion during the September 29, 2026, hearing, the Court notes that the subclasses in this case encompass all FY-26 Diversity Visa applicants. The Court directs the parties to the Court's order granting class certification, where it certified three subclasses of Diversity Visa applicants affected by the three policies. Class Cert. Order, ECF No. 83. According to Plaintiffs, the three policies at issue collectively placed an "indefinite 'hold' *on all immigration benefits for DV applicants*." Compl. ¶ 221, ECF No. 1 (emphasis added).

United States District Court
Northern District of California

an additional ten days past the 2026 fiscal year to reconsider FY-26 applications refused solely under the DOS DV Pause or the DOS 75-Country Pause and resume ordinary adjudication of pending applications.[10]

- To the extent that DOS requires additional time to create guidance for diplomatic and consular posts to comply with this Order, DOS must seek leave of Court for a temporary stay of enforcement.
- The Court expects prompt communication from DOS regarding any unforeseen issues that may impact compliance with this Order.
- DOS shall continue filing status reports in accordance with the Court's Order Enforcing Preliminary Injunction, ECF No. 93, by 12:00 p.m. (PT) every Monday, Wednesday, and Friday until the additional adjudication period is complete.
- The Court **SETS** a status conference for October 15, 2026, at 10:00 a.m.

**IT IS SO ORDERED.**

Dated: September 30, 2026

EDWARD J. DAVILA
United States District Judge

[10] The Court incorporates the definitions described in the PI. *See* PI Order 3–4.